IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BYRON W. MARTZ                    *
                                  *
                                  *
v.                                *         Civil No. CCB-15-3284
                                  *
                                  *
DAY DEVELOPMENT COMPANY,          *
L.C., *et al.*                    *
                                  *

## MEMORANDUM

Pending before the court is defendants Day Development Company, L.C. ("DDC") and Southlawn Lane Properties, L.L.C.'s ("Southlawn") (collectively, "the development company")[1] renewed motion for judgment as a matter of law (ECF No. 85) and plaintiff Byron W. Martz's cross-motion for judgment (ECF No. 86). Martz's Amended Complaint contains four counts: (I) Breach of Contract (Domiciliary Care Parcel); (II) Breach of Contract (Commercial Parcel); (III) Declaratory Judgment; and (IV) Unjust Enrichment. (Am. Compl. ¶¶ 82–121, ECF No. 27). The court previously granted summary judgment on liability in Martz's favor as to Counts I and II. (ECF Nos. 53, 54). A four-day bench trial has been held. For the reasons outlined below, the court will deny the development company's motion for judgment as a matter of law and will enter judgment in Martz's favor as to Count IV of the Amended Complaint.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]

---

[1] DDC and Southlawn are "affiliated limited liability companies owned by the same members." (Joint Exhibit ("J.E.") 33). Accordingly, the court will refer to defendants DDC and Southlawn collectively as "the development company" unless discussing transactions involving DDC prior to the transfer of the Domiciliary Care and Commercial Parcels to Southlawn. *See* Part D, *infra.*

[2] The court heard evidence related to many additional facts. For the sake of judicial economy, the court limits its findings of fact to facts essential to the resolution of the case.

This dispute arises out of a series of contractual agreements between Martz and the development company regarding real property located in Frederick County, Maryland. Based on evidence adduced at the bench trial held on October 5, 2018, January 3, 2019, and January 4, 2019,[3] the court makes the following findings of fact and conclusions of law.

A. **1996 Purchase Agreement**

On March 21, 1996, Bernard E. Burkett, III, Earl E. Burkett, and Martz (collectively the "Sellers") entered into a purchase agreement ("1996 Purchase Agreement") with Horizon Development and Interest Company, L.L.C. ("Horizon") for the sale of real property located in Frederick County, Maryland.[4] (J.E. 3). In the 1996 Purchase Agreement, Horizon agreed to pay the Sellers a minimum purchase price of $2,725,000.00, plus "fifty percent (50%) of the finished lot value of any portions of the Property which are designated as Commercial, Office or other development designation than Residential (the "Commercial Property")." (*Id.* ¶ 2.1).[7] In 1999, Horizon assigned its rights under the 1996 Purchase Agreement to Valley Ranch Associates, L.L.C. ("Valley Ranch"), (J.E. 9-A); in 2000, Valley Ranch assigned these rights to DDC. (J.E. 9-B).

B. **2003 Consulting Services Agreement**

In 2003, DDC and Martz entered into a Consulting Services Agreement (the "2003 CSA") regarding a portion of the property known as the Domiciliary Care Parcel. (J.E. 13). DDC had previously obtained approval from the City of Frederick to develop a 189-unit domiciliary care facility on the Parcel but sought to amend its approved development plan. Under the 2003 CSA,

---

[3] Closing arguments were heard on May 29, 2019. (ECF No. 89).
[4] Pursuant to a Termination of Option Agreement executed on September 8, 2005, Bernard E. Burkett, III, and Earl E. Burkett transferred all their remaining rights under the 1996 Purchase Agreement to Martz. (J.E. 19 at 2).
[7] The parties amended the Purchase Agreement several times. (*See* J.E. 4 ("First Amendment To Purchase Agreement"); J.E. 8 ("Second Amendment To Purchase Agreement"); J.E. 10 ("Third Amendment To Purchase Agreement"), J.E. 11 ("Fourth Amendment To Purchase Agreement"), J.E. 14 ("Fifth Amendment To Purchase Agreement")).

2

Martz agreed to "assume primary responsibility" for applying to the City of Frederick for an amendment "so that the permitted use for the Domiciliary Care Parcel shall be a multistory residential condominium project." (*Id.* at 2(b)). Martz and DDC agreed to "share equally all costs incurred by Martz in having such application prepared, submitted and pursued with the City of Frederick." (*Id.*).

The 2003 CSA outlined two methods for calculating Martz's compensation. If Martz obtained the amendment from the City of Frederick, but DDC decided to sell the Domiciliary Care Parcel "for use as a condominium project to a third party," DDC agreed to pay Martz 50 percent of its net profit on the sale. (*Id.* at 4(a)).[8] If Martz obtained the amendment and DDC decided to build the condominium units, DDC agreed to pay Martz 50 percent of the net appraised value of the Domiciliary Care Parcel. (*Id.* at 4(b)).[9] The 2003 CSA also specified that Martz would be paid

---

[8] In full, 4(a) of the 2003 CSA provided:
> If Martz obtains the Approvals for the Proposed Use but DDC subsequently sells the Domiciliary Care Parcel for use as a condominium project to a third party, then the amount of the compensation shall be equal to fifty percent (50%) of the "Net Profit" from the sale of the Domiciliary Care Parcel. For the purpose of this paragraph, Net Profit is defined as (i) the net sales proceeds from the sale of the Domiciliary Care Parcel, less (ii) $1,890,000. By way of example, if there are 189 condominium units and the net proceeds of a sale of the Domiciliary Care Parcel is $5,670,000 (i.e. $30,000 per unit), then Martz would receive $1,890,000 ($5,670,000 less $1,890,000 times 50%). Any sale of the Domiciliary Care Parcel by DDC to a third party, after Martz obtains the Approvals, must be an arm's length transaction with a third party unrelated to DDC. In the event DDC sells the Domiciliary Care Parcel to a related entity, in a non-arm's length transaction, Martz shall have the option of either computing the compensation on the basis of the purchase price as described in this subparagraph a, or of invoking the appraisal procedure set forth in subparagraph b below.

(*Id.* at 4(a)).

[9] In full, 4(b) of the 2003 CSA provided:
> If Martz obtains the Approvals and DDC obtains building permits and DDC elects to build the condominium units, then the amount of the compensation shall be an amount equal to fifty percent (50%) of the Net Appraised Value of the Domiciliary Care Parcel. For the purpose of this paragraph, Net Appraised Value is defined as (i) the fair market value of the Domiciliary Care Parcel, as approved for the Proposed Use with building permits issued less (ii) $1,890,000. If the parties cannot agree on a fair market value, then each party shall designate an appraiser and the two appraisers shall choose a third appraiser. All appraisers must be on the list of appraisers approved or certified by the Bank of America and must have specific expertise in the valuation of this type of project. Each party shall bear the expense of its appraiser and the parties shall split the cost of the third appraiser.

(*Id.* at 4(b)).

3

upon the happening of one of three events, whichever was earlier: (1) "A sale of the Domiciliary Care Parcel, or a portion thereof; (2) "Obtaining by DDC or other builder, in the event of assignment, a building permit for the construction of any units on the Domiciliary Care Parcel . . ."; or (3) "January 1, 2015." (*Id.* at 4(c)(i)–(iii)). Pursuant to the 2003 CSA, DDC's obligation to pay Martz "shall survive any sale of the Domiciliary Care Parcel, and any termination of this Agreement, and shall be binding upon any transferee, assignee or successor in interest of DDC to the Domiciliary Care Parcel." (*Id.* at 4(c)).

C. **2005 ACSA**

In 2005, DDC and Martz executed an amendment to the 2003 CSA (the "2005 ACSA"), which expanded the scope of Martz's consulting services. (J.E. 17). The 2005 ACSA stated that Martz would provide consulting services regarding development of the "Commercial Parcel," another portion of the land originally sold pursuant to the 1996 Purchase Agreement. Like the 2003 CSA, the 2005 ACSA set forth two potential methods for determining Martz's compensation. First, if DDC decided to sell the Commercial Parcel, "DDC shall pay Martz fifty percent (50%) of the finished lot value of the Commercial Parcel . . . [and] the net proceeds of sale shall be divided equally between DDC and Martz."[10] (*Id.* at 6(b)). Second, if DDC decided to build on the Commercial Parcel, Martz was entitled to "to fifty percent (50%) of the Net Appraised Value of the Commercial Parcel."[11] (*Id.*) Once again, DDC agreed to pay Martz upon the happening of one of three events, whichever was earlier: (1) "A sale of the Commercial Parcel, or portion thereof"; (2) "Obtaining by DDC or other builder, in the event of an assignment, a building permit for the

---

[10] The agreement defined "net proceeds" as "total sale proceeds less usual costs of settlement, such as transfer taxes, prorated public charges, and real estate commission, if any." (J.E. 17 at 6(b)).

[11] The agreement defined "Net Appraised Value" as "the fair market value of the Commercial Parcel, as finished commercial lots or parcels, without any deduction attributable to DDC's cost of the Commercial Parcel inasmuch as DDC has paid no additional consideration for the Commercial Parcel." (*Id.*) The 2005 ASCA also reincorporated the provision of the 2003 CSA stating that if the parties cannot agree on a fair market value, "each party shall designate an appraiser and the two appraisers shall choose a third appraiser." (*Id.*; J.E. 13 at 4(b)).

4

construction of any commercial units on the commercial lots or parcels of the Commercial Parcel . . ."; or (3) January 1, 2015. *Id.* at 6(c)(i)-(iii)). The 2005 ACSA provided that DDC's obligation to pay Martz "shall survive any sale of the Commercial Parcel, and any termination of this Agreement, and shall be binding upon any transferee, assignee or successor in interest of DDC to the Commercial Parcel." (*Id.*).

### D. Transfer of Domiciliary Care and Commercial Parcels to Southlawn

On November 30, 2005, DDC granted the Domiciliary Care Parcel and the Commercial Parcel to Southlawn for "no monetary consideration." (J.E. 33). DDC and Southlawn did not formally record this transfer until 2012. (*Id.*).

### E. The Development Company Does Not Sell or Build on Parcels Prior to January 1, 2015

The parties do not dispute that as of January 1, 2015, neither the Domiciliary Care Parcel nor the Commercial Parcel had been sold to a third party, and the development company had not begun construction on the Parcels. At trial, the development company contended that they could not sell or develop either Parcel because of poor market conditions. Martz presented significant evidence, in the form of witness testimony, that established by a preponderance of the evidence that the Parcels could have been profitably sold or developed. In any event, the contracts did not provide for a later payment date than January 1, 2015, even if market conditions were poor.

#### 1. Testimony of Walter C. Martz[13]

The plaintiff's brother, Walter C. Martz ("Walter"), testified at trial regarding his knowledge of development on the land surrounding the Domiciliary Care and Commercial Parcels. (Trial Tr. Oct. 5, 2018, at 47:2–18, 48:2–13). Walter testified that the southern portion of the

---

[13] As with its findings of fact, the court limits its description of the witnesses' testimony to the testimony necessary for resolution of the case.

5

Burkett farm, which was part of the property originally sold pursuant to the 1996 Purchase Agreement, "has all been developed . . . by Mr. Day[14] and other builders." (*Id.* at 47:2–8). Walter also testified about the development of property adjacent or near to the Parcels.[15] (*Id.* at 47:15–48:13).

### 2. Testimony of Byron Winebrenner Martz

Martz testified that he obtained the approvals as specified by the 2003 CSA and that it was his understanding that if the development company did not build or sell the Domiciliary Care Parcel by January 1, 2015, "[i]t would be appraised as finished lots, permits pulled, and I would be paid." (*Id.* at 66:21–67:1). Martz also testified that in November 2014, he called Mr. Day to inquire about the status of his compensation. (*Id.* at 70:7–12). According to Martz, Mr. Day responded, "I'm not going to pay you, and I'm just going to take the property from you." (*Id.*)[16]

### 3. Testimony of Terrence W. McPherson

Both Martz and the development company called McPherson, an expert in the field of real estate appraisal, to testify at trial. McPherson testified that the development company hired him[17] to assess the value of the Domiciliary Care and Commercial Parcels.[18] (Trial Tr. Oct. 5, 2018, at 117:22–118:3). The development company first approached McPherson in 2012 to conduct an appraisal "for internal decision-making regarding the development of the property." (Id. at 118:1–7). McPherson finalized his appraisal in 2013. (*Id.* at 120:15–18). McPherson's appraisal of each

---

[14] Walter is likely referring to Francis "Mike" Day; according to the pleadings, Mr. Day is the owner and controller of the development company.
[15] Walter testified that there was "extensive development of everything on the Martz property . . . many of those lots have been sold by Mr. Day [.]" (Trial Tr. Oct. 5, 2018, at 47:15–18). Walter also noted that directly to the west of the Martz farm, the Albaugh farm "has been completely and fully developed." (*Id.* at 48:2–13).
[16] The development company did not rebut this testimony and Mr. Day did not testify at trial.
[17] McPherson testified that his conversations were with Mr. Brownell, who was the attorney representing DDC. (Trial Tr. Oct. 5, 2018, at 95:7–10).
[18] At trial, the Domiciliary Care Parcel was sometimes referred to as "lot one" or the "multifamily parcel," and the Commercial Parcel was sometimes referred to as "lot two." (*Id.* at 6:5–10).

6

Parcel was based on the hypothetical conditions that the roads in each Parcel were complete and the proposed uses for each Parcel were approved. (Trial Tr. Oct. 5, 2018, at 132:22–133:4; Trial Tr. Jan. 4, 2019, at 60:5–22). McPherson determined that the highest and best use of the Domiciliary Care Parcel was for development as two-over-two residential condominiums and that there was adequate demand for these condominiums. (Trial Tr. Oct. 5, 2018, at 130:10–21). McPherson also noted that at the time of the 2013 appraisal, the development company was taking no efforts to sell the Domiciliary Care Parcel. (Trial Tr. Jan. 4, 2019, at 112:1–4). McPherson concluded that the fair market value of the Domiciliary Care Parcel was $4,200,000.00.[19] (*Id.* at 132:22–133:9, 133:14–134:12). McPherson also determined that there was some demand for the Commercial Parcel, (*id.* at 130:3–5), and valued it at $1,100,000.000, subject to the completion of the roads.[20] (*Id.* at 134:24–135:4).

### 4. Testimony of William J. Holtzinger

Holtzinger, an expert in civil engineering and land development in Frederick City, Maryland, testified that 132 two-over-two condominium units could be constructed on the Domiciliary Care Parcel. (Trial Tr. Oct. 5, 2018, at 149:15–20, 159:11–14). Holtzinger testified that the Domiciliary Care Parcel was approved for multifamily use, which can include any housing type that falls within the category of "multifamily" as defined by the City of Frederick. (*Id.* at 156:19–23). Holtzinger also testified that at the time of trial, the road across the Commercial Parcel was under construction. (Trial Tr. Jan. 3, 2019, at 57:19–58:22).

### 5. Testimony of Thomas A. Wiegand

---

[19] McPherson also prepared a report in April 2017, after the commencement of litigation. (Trial Tr. Jan. 4, 2019, at 105:5–10, 106:12–18). In this later report, McPherson concluded that the value of the Domiciliary Care Parcel was $2,450,000, subject to the same hypotheticals as his first appraisal. (*Id.* at 106:7–21).

[20] McPherson's appraisal of the Commercial Parcel assumed that it was plan-approved with "the streets in." (*Id.* at 132:22–133:4).

7

Martz called Weigand to give expert testimony in the area of land valuation. (Trial Tr. Jan. 3, 2019, at 90:7–12). Weigand testified that the "permit-ready" value of the Domiciliary Care Parcel was $6,910,000.000 as of January 1, 2015.[21] (*Id.* at 121:6–8). Weigand further valued the Commercial Parcel, as a building permit-ready commercial lot, at $1,420,000.00. (*Id.* at 150:2–9).

### 6. Testimony of David A. Lingg

The development company called Lingg as an expert in land and urban planning in Frederick County. (Trial Tr. Jan. 4, 2019, at 22:15–18). Lingg testified about the cost and delay that would likely be associated with the development of the Domiciliary Care and Commercial Parcels. Specifically, Lingg testified that two-over-twos were not selling well in Frederick or in nearby Urbana, Maryland. (*Id.* at 35:7–36:6).

### 7. Testimony of Thomas H. Lawrence

Lawrence, the former president of DDC, admitted that during his deposition he testified that DDC put the January 1, 2015, deadline in its contracts with Martz because DDC believed "[the condominiums] would at least be under construction by that time. There was no way we thought that we weren't going to be able to meet 2015 or we wouldn't have put it in the contract. Period." (Trial Tr. Jan. 4, 2019, at 144:8–9, 174:2–175:16).

## F. **The Development Company Breached Contractual Duties**

The development company asserts that to establish breach of contract, Martz has the burden to show that the development company intentionally failed to sell or develop the Parcels. (Def.'s Renewed Mot. for Judgment, ECF No. 85-1 at 6). Not so. In its April 25, 2018, ruling on the parties' cross-motions for summary judgment, the court found that the development company had breached its contractual duties under the 2003 CSA and the 2005 ACSA to compensate Martz.

---

[21] Weigand defined the "permit-ready" or "finished lot" value as the value of the parcel if it were permit-ready for the construction of 132 two-over-two condominium units. (Trial Tr. Jan. 3, 2019, at 120:21–121:8).

8

(ECF Nos. 53 (Memorandum), 54 (Order)). Specifically, the court concluded that the only condition precedent for the development company to compensate Martz under both the 2003 CSA and the 2005 ACSA was Martz's obtainment of "Approvals for the Proposed Use." (ECF No. 53 at 2). Once that condition precedent was met, the development company owed Martz compensation upon the occurrence of any of three events: (1) the sale of the property to a third party; (2) DDC's development of the property; or (3) on January 1, 2015. (*Id.*). The parties do not dispute that Martz obtained the approvals specified in the contracts. Accordingly, the development company was required to compensate Martz as of January 1, 2015, and breached that duty by failing to provide compensation. (*Id.* at 2–3). The focus of the bench trial was to determine *what amount* of compensation was due to Martz.

The development company also asserts a defense of legal impossibility with respect to its obligation to compensate Martz under the 2005 ACSA for his consulting on the Commercial Parcel. Specifically, the development company argues that "development of the Parcel is a legal and practical impossibility since no permit can issue because of the City's failure to complete the road [across the Commercial Parcel]." (Def.'s Renewed Mot, ECF No. 85-1 at 7). The development company argued that without a completed road, "there is also no market for the sale of the Parcel." (*Id.*). The court is not persuaded. As the court has previously ruled, the plain language of both the 2003 CSA and the 2005 ACSA obligated the development company to pay Martz no later than January 1, 2015, irrespective of the progress of any infrastructure on the Parcels.

The development company's reliance on *Acme Moving & Storage Corp. v. Bower*, 269 Md. 478 (1973), to show legal impossibility is misplaced. While it is true that "the inability to obtain a necessary governmental permit to carry out a contract . . . will give rise to a defense of

impossibility of performance if such interference was not foreseeable at the time of the execution of the contract and the risk was not assumed by the promisor," *id.* at 483, that was not the situation here. Completion of the road may have been a requirement to *build* on the Commercial Parcel, but there is no reason the development company could not have *sold* it, which was the other option under the 2003 CSA and the 2005 ACSA. The court is skeptical of the development company's claim that the Commercial Parcel is valueless, especially in light of testimony establishing that the road in question was under construction at the time of trial. Indeed, as the transactions in this case have shown, there *is* a market for property that is not presently ready for development. The inability to choose one of two options specified in the contracts did not excuse the development company's performance, and certainly did not release the development company from its contractual obligation to compensate Martz by January 1, 2015.

## G. The Contracts Between The Parties Do Not Address What Compensation Is Due Under The Current Circumstances

In Maryland, "where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed." *Kasten Constr. Co., Inc. v. Rod Enters., Inc.*, 268 Md. 318, 328 (1973). A contract is ambiguous if it is "subject to more than one interpretation when read by a reasonably prudent person." *John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327 (Md. 2010) (quoting *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 167 (2003)). The parties are agreed that it is in the province of the court to determine the meaning of the contracts between them. Further, a contract "need not be evidenced by a single instrument." *Rocks v. Brosius*, 241 Md. 612, 637 (1966). "This is true even though the instruments were executed at different times and did not in terms refer to each other." *Id.*

The 2003 CSA does not provide a method of calculating how much compensation is owed to Martz. While the 2003 CSA sets forth two formulas for calculating the amount of compensation due to Martz for his work related to the Domiciliary Care Parcel, (J.E. 13), neither addresses the current circumstances. Section 4(a) sets forth a formula for calculating compensation due to Martz in the event that DDC sells the Domiciliary Care Parcel to a third party, (*id.* at 4(a)); Section 4(b) sets forth a formula in the event that DDC "obtains building permits and DDC elects to build the condominium units," (*id.* at 4(b)). The parties do not dispute that neither of these triggering events have occurred. Instead, Martz argues that by retaining the Parcels, the development company has, in effect, elected to build them, thereby triggering the compensation formula outlined in section 4(b). The court does not agree. The language of the 2003 CSA is clear: section 4(b) applies only if the development company "obtains building permits and DDC elects to build the condominium unit." As the development company has not obtained any building permits, section 4(b) does not apply. And neither party contended that section 4(a) governs the circumstances at hand. Accordingly, the 2003 CSA does not address how much compensation is due to Martz for his work related to the Domiciliary Care Parcel in the present situation, where the development company elected to retain the Parcel but has not obtained building permits or begun development.

The same analysis holds true for the 2005 ACSA. Under the 2005 ACSA, the development company must pay Martz 50 percent of the finished lot value of the Commercial Parcel if it is sold to a third party, or 50 percent of the net appraised value of the Commercial Parcel if the development company "elects to build on the Commercial Parcel." (J.E. 17 at 6(b)). The development company has neither sold nor elected to build on the Commercial Parcel. Accordingly, the 2005 ACSA does not answer how much compensation is due to Martz for work

11

regarding the Commercial Parcel, where the development company has neither sold nor developed the Parcel.

## H. Martz's Unjust Enrichment Claim May Proceed Because The Contracts Are Silent As To Compensation

"The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests." *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md. App. 766, 776 (1984) (internal citation and quotation marks omitted). But courts depart from this general rule "when the express contract does not fully address the subject matter." *Janusz v. Gilliam*, 404 Md. 524, 567–68 (2008) (quoting *Cty. Com'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 100 (2000)); *see also State Farm Mut. Automo. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d. 536, 560 (D. Md. 2019). In these cases, litigants may bring claims for unjust enrichment.

Unjust enrichment claims recognize the "core principle" that "[a] person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment." *Maryland Cas. Co. v. Blackstone Inter. Ltd.*, 442 Md. 685, 706 (2015) (quoting *Berry & Gould P.A. v. Berry*, 360 Md. 142, 151 (2000)). The Maryland Court of Appeals has held that for a claim of unjust enrichment to succeed, the plaintiff must show: (1) "A benefit conferred upon the defendant by the plaintiff"; (2) "An appreciation or knowledge by the defendant of the benefit"; and (3) "The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007) (quoting *Berry*, 360 Md. at 151–52). The third element of an unjust enrichment claim requires "a fact-specific balancing of the equities,"

as "[t]he task is to determine whether the enrichment is unjust." *Id.* at 301 (internal citation omitted).

The court finds that Martz has easily satisfied the first two elements of proving his claim of unjust enrichment. First, Martz presented evidence as to the benefit the development company gained from his obtaining the Approvals for the Domiciliary Care and Commercial Parcels; specifically, he presented evidence regarding each Parcel's appreciation in value. Second, Martz demonstrated that the development company had knowledge of this benefit through McPherson's 2013 appraisal of the Parcels.

The court's conclusion regarding the third element of Martz's unjust enrichment claim is less straightforward. The development company clearly received the benefit of the Parcels' appreciation in value by neither selling nor developing the Parcels, thereby not invoking its clear obligations to pay Martz under the 2003 CSA and the 2005 ASCA. Allowing the development company to retain this benefit *in its entirety* would be inequitable. But the development company's retention of *some* of that value cannot be fairly characterized as "unjust." While the 2003 CSA and 2005 ACSA do not address the situation at hand, *see* Part G *supra*, the compensation schemes set forth in those agreements are instructive. Roughly speaking, each scheme provided that if Martz obtained the requisite Approvals, he would receive 50 percent of the increased value—as established by sale price or appraisal—of the property. This indicates a shared understanding that the value of Martz's consulting services should be 50 percent of any appreciation in value. Based on the value the parties themselves placed on Martz's services, the court finds that the development company was unjustly enriched, but only as to 50 percent of the Parcels' appreciation in value.

The theory of unjust enrichment "is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense."

*Mass Transit*, 57 Md. App. at 775. The amount of restitution is thus based on the "value of the goods or services rendered by the plaintiff in the hands of the defendant." *Blackstone Intern.*, 442 Md. at 709 (citing *Mogavero v. Silverstein*, 142 Md. App. 259, 276 (2002) (internal quotation omitted)). Accordingly, Martz is entitled to restitution in an amount equal to 50 percent of the Parcels' appreciation in value.

To establish the amount of restitution owed, the court turns to the evidence established at trial. With respect to the Domiciliary Care Parcel, Martz presented evidence that before he obtained the Approvals as specified in the 2003 CSA, the Parcel was worth $1,417,500.00—the amount of money the development company paid for the Parcel.[22] The court finds that McPherson's 2013 appraisal, conducted for the benefit of the development company and prior to the commencement of this litigation, provides a reliable and equitable basis upon which to determine restitution.[23] McPherson testified that in 2013, the fair market value of the Domiciliary Care Parcel was $4,200,000.00. Accordingly, the court finds that the development company's gain from Martz's efforts is the difference between these two values: $2,782,500.00. Martz is entitled to 50 percent

---

[22] The 2003 CSA implicitly reflects this purchase price by subtracting $1,417,500 from the compensation Martz would be due if the development company sold the Domiciliary Care Parcel prior to obtaining the Approvals. (J.E. 13 at 3(a)). Based on a preponderance of the evidence, this sum is derived from the Second Amendment to the Purchase Agreement, which held that the "[p]urchaser shall be required to pay seven thousand five hundred and No/100ths dollars ($7,500.00) for each such lot." (J.E. 8 at 1). Multiplying $7,500.00 by 189, the number of anticipated domiciliary care units equals $1,417,500. This sum is further referred to as the purchase price for the Domiciliary Care Parcel in the Fifth Amendment to the Purchase Agreement. (J.E. 14 at 2(a) ("The Memorandum of Contract shall provide notice that Purchaser has the right to Purchase the Domiciliary Care Facility Land for a total purchase price of $1,417,500.")).

[23] The court recognizes that McPherson's 2013 appraisal does not represent the exact value of either Parcel as of January 1, 2015. When exercising its equitable powers, the court has broad discretion in determining whether to award equitable remedies and in what amounts. *Cf. S.E.C. v. Resnick*, 604 F. Supp. 2d 773, 782 (D. Md. 2009) (discussing the equitable remedy of disgorgement in the context of a securities fraud case, noting that "the district court has broad discretion in determining whether to award disgorgement and in what amount . . . [A] court's disgorgement calculation need only be a reasonable approximation of gains causally connected to the fraud."). As both Martz and the development company called McPherson to testify as an expert at trial, the court finds his estimate of the value of each Parcel to be the most equitable starting point for calculating restitution. McPherson also was well qualified to provide opinion testimony given his 35 years of experience as a real estate appraiser in Frederick County. (Trial Tr. Oct. 5, 2018, at 116:10–117:21).

of this sum—$1,391,250.00—as compensation for his work in obtaining the Approvals for the Domiciliary Parcel.

With respect to the Commercial Parcel, the court initially finds that the development company did not pay Martz any money to obtain title to the Parcel. (*See* J.E. 3 at 2.1; *see also* J.E. 17 at 6(b) ("DDC has paid no additional consideration for the Commercial Parcel")). Instead, upon transferring title to the development company, Martz maintained an equitable interest in the Parcel.[24] Essentially, the parties placed the starting value of the Parcel at $0 and indicated through their agreements that the value of Martz's consulting services was 50 percent of any appreciation in value. McPherson testified at trial that he valued the Commercial Plot at $1,100,000.000 as an unfinished commercial lot. (Trial Tr. Oct. 5, 2018, at 134:24–135:4). The development company has been unjustly enriched by 50 percent of that value; that is, $550,000.00. Martz is entitled to restitution in that amount.

## CONCLUSION

For the foregoing reasons, the defendants' motion for judgment as a matter of law will be denied. The court previously granted summary judgment on liability for breach of contract in Martz's favor as to Counts I and II of the Amended Complaint, (ECF Nos. 53, 54), and will now enter judgment in Martz's favor as to Count IV and award him $1,941,250.00 in restitution. The court will dismiss Count III as moot. A separate order follows.

9/25/19
Date

Catherine C. Blake
United States District Judge

---

[24] *See* J.E. 18 at 3 ("Martz has an equitable interest in and to the Joint Properties . . .").

15